May it please the Court, my name is Tom Saunders. I'm counsel for Appellant Wood. I'd like to reserve three minutes of my time for rebuttal. The district court's grant of summary judgment to Officer Martin on Wood's Eighth Amendment sexual harassment claims rested on three fundamental errors of law. First, the Court incorrectly concluded that Mr. Wood consented to specific acts of sexual abuse because those acts occurred during a period in which before he had definitively ended his relationship with Officer Martin. This relationship rule Why don't you tell us a little bit about the facts, so the people sitting in the audience here have a better idea of what you're talking about. Sure. In this case, you have a situation in which inmate Wood was incarcerated and came into contact with correctional officer, Officer Martin. Over a period of time, they developed a relationship that was largely based on companionship, talking. It did involve some kissing and hugging, but did not involve sexual conduct. It was described as romantic, but not sexual. Correct. Wood became aware at some point that, contrary to his assumptions, Officer Martin was married. And to Wood, this was severely problematic. He is a deeply religious man and did not want to be complicit in committing adultery. However, because he was incarcerated, there was very limited ability that he had to investigate the facts of the case and get to the bottom of this. However, he had, because of his uncertainty regarding the rumors of Officer Martin's marriage, told her that they needed to back away from their relationship. The appeal here focuses on three specific instances that happened after that. First was shortly after Wood had told Officer Martin that they needed to back away. She came into his cell about 20 minutes later and came up to him and cupped his groin in an attempt to, I think, woo him back into the relationship. He objected to this conduct and he, in his testimony, said he literally pushed her away. There was another instance in which Officer Martin was conducting a path search of Wood in front of other inmates and began fondling him in a sexually harassing manner that he was not comfortable with. She was trying to harass him in front of other inmates. He again specifically objected to this conduct and said, please don't do that. The third specific instance of harassment in which the appeal focuses arose after Wood had definitively ended his relationship with Martin. She entered his cell while he was there in his gym shorts, ordered him against the wall, and began conducting what appeared to be a path search of him. But she reached into his gym shorts, began stroking his penis, and made sexual comments to him at that time. The district court granted summary judgment on all of these instances. Really, I think its reasoning falls into two categories. For the conduct that happened before Wood had definitively told Martin that the relationship is over, the district court reasoned that because this conduct occurred during the course of a consensual relationship, it could not be actionable under the Eighth Amendment. You said that you granted summary judgment on everything. One part did go to trial. Yes, correct. After the relationship ended, there had been a series of retaliatory path searches that were conducted. And that went to trial. That went to trial. With the verdict against your client. Correct. So here though, this appeal is really focusing on the legal error of the rule in which the district court reasoned that because these events happened during the course of a relationship, the specific instances could themselves not be actionable. Now there has been back and forth in the briefs about whether a prisoner is ever capable of consenting to a relationship with a correctional officer, given the custodial relationship there. The reality is that to resolve this case, this court doesn't need to reach that question because it can recognize that the district court conflated the concept of general consent to enter into a relationship with specific consent to particular sexual acts. And here on the record, you have Mr. Wood telling Officer Martin that they needed to back away from the relationship. One instance pushing her away, asking her please don't do that. And all of those objections were sufficient to show that as to the specific accident issue here, you can't grant Officer Martin's summary judgment on a theory of consent. The other issue of law relating to the Jim Shorts incident, that happened after the relationship was definitively ended. So the district court couldn't rely on its consent rationale. So instead, it said that that claim was not actionable for two reasons. One was it deemed that the conduct itself was not sufficiently serious to violate the Eighth Amendment. And second, the court said that there wasn't sufficient evidence that Officer Martin had acted with a sufficiently culpable mental state. I submit that both of these rulings are erroneous. On the question as to whether the conduct was sufficiently serious, we have cited in our opening brief beginning on page 46, a long series of cases that involve comparable conduct of sexual harassment that was found to be sufficiently serious to violate the Eighth Amendment. We also have demonstrated a national consensus arising from legislative acts that prohibit a broad range of sexual contact between prisoners and correctional officers. As for the mental element, the court's reason was essentially that you have a standard in excessive force cases that looks to whether force is being used maliciously and sadistically. The court then took that standard and applied it to a sexual harassment case and reasoned that because Officer Martin was groping Wood in an attempt to woo him back into the relationship, this couldn't have been conduct that was for the purpose of causing harm. This reasoning is erroneous for several reasons. First, the Supreme Court has made clear that the standard to be applied has to be responsive to the specific conduct that is alleged. It doesn't make sense to take a malicious and sadistic standard that was developed for cases of excessive force with all the exigencies of those situations and apply it to this type of sexual harassment because if you do, you end up with the bizarre rule that was applied in this case, which is that because Officer Martin was acting with the intent to sexually gratify herself, that is not sufficiently wanton conduct to violate the Eighth Amendment. And this is clearly a rule of law that could cause great mischief in the future and is not one that should be allowed to stand. One other note I should just back up on the consensual conduct. I would be remiss if I didn't mention that the District Court had for one of the incidents, the first groin cupping incident, also noted deposition testimony given by Mr. Wood in which he was asked whether the conduct was objectionable per se and he said that he didn't. I think it's very important, though, that if this Court is to read the record in the light most favorable to Mr. Wood as the one opposing summary judgment, that you look carefully at that statement and recognize that Mr. Wood was not saying that the conduct that actually occurred was not objectionable. What he was saying was that under different circumstances, if he had been certain that Martin wasn't married, then yes, he wouldn't have found that conduct objectionable per se. But the fact is it must be measured in light of the circumstances in this case, which is that he did have concerns that Martin was married. He had told her they needed to back away from the relationship. Tell me, if you will, about the retaliatory claim on the First Amendment. For the retaliatory transfer? Yes. Yes, I think the main thing on that claim is that in the first instance it goes to Mr. Wood's 56th motion in which he had asked for records relating to other inmates who were allegedly involved in relationships with Ms. Martin. And he wanted those records to help compare them to his case so that he could prove that the reasons given— And he didn't get them. Right. He did not get those records. There was no motion. After the motion to compel, what happened? After the motion to compel, then the defendants proceeded with their motion for summary judgment. Wood filed a motion to stay, and he filed an opposition to the summary judgment. He specifically stated in his opposition brief that it was supported by the accompanying motion for a stay of proceedings. And in that stay motion, he had said that this stay motion relates to the discovery that I had requested and sought to compel in an earlier motion from 2005. So, you know, perhaps he could have more clearly teed up this issue to the court in his opposition, but the reality is at this point in the proceedings he was still proceeding pro se. And for him to say in his opposition, I refer you to my motion to stay, and for that motion to stay, to say I refer you to this motion to compel, and then for the court to go forward and grant summary judgment on this failure to protect claim when he didn't have access, I'm sorry, on the fatality charge transfer claim when Mr. Wood didn't have access to those records was error. And under this court's precedence, when the district court fails to even rule one way or another on a 56-F motion like this, this review is not for abuse of discretion. It is de novo. And in this case, there was a genuine issue of fact as to whether the reasons given for Mr. Wood's transfer were pretextual. In particular, I point the court to the portion of the record in which when he is having his confrontation with Lieutenant Thomason right on the night that he's being transferred out, she says to him that if Wood will turn over a lock of hair that he had received from Martin and notes, then he wouldn't be transferred. And, you know, which casts doubt on the explanation that the transfer was entirely for his protection. Also, Wood's understanding, although he needs access to the records to prove this, was that for the other prisoners who allegedly had relationships with Officer Martin, they were not immediately transferred out of the institution. Instead, steps were taken to separate them from Officer Martin while an investigation was occurring. So I think this is a pretty straightforward case in which additional discovery was needed and was not provided. If I just may briefly touch on the failure to protect claim as well. This was a claim against Martin's supervisors. Again, a claim that may look very different on remand if those records regarding the other inmates are forthcoming because really one of the key allegations in that claim, in addition to the documented instances of inappropriate touching of inmates that were in personnel file, was the allegation that the prison officials were aware of these prior investigations involving Officer Martin and didn't take adequate steps to curb her extremely broad access and control over inmates. And as a result of that, put Inmate Wood in a position where he was subject to sexual abuse. I think one of the mistakes that's made in looking at this claim, Mr. Wood's allegation has never been that the prison officials specifically knew about the abuse that was occurring with him. But that, as the Supreme Court has made clear in Farmer v. Brennan and other cases, is not the standard. The standard is the risk that is created. And that risk was obvious from these relationships with the other inmates and remedial action should have been taken. That could apply to all the prisoners. That could apply to all of the other prisoners as well. Right. In terms of who would be protected, sure, but the remedial action would have been taken with respect to Martin herself, not with respect to just an indeterminate number of other prisoners. I don't see them into my rebuttal time. Very well. Thank you. May it please the Court, my name is Keely Duke and I represent the Idaho Department of Corrections along with the individually named Department of Correction employees including Sandra Martin. After eight and a half years of litigation, after Mr. Wood was assigned counsel by the University of Idaho legal clinic who also sat through the trial with him and a week-long trial related to 16 different PAT searches that were performed after this alleged relationship between Sandy Martin and Mr. Wood occurred, we are here today before you on two very distinct separate issues. The two issues as defined by Mr. Saunders are that the summary judgment by Judge Windmill was inappropriate related to the three alleged incidents involving Ms. Martin and Mr. Wood during a relationship they had and one that occurred after the relationship had terminated. The second issue is the summary judgment by Judge Windmill dismissing Mr. Wood's Eighth Amendment failure to protect claims with respect to the administrative officials. Related to that first claim I will note obviously we're under a summary judgment standard so when I speak throughout the rest of this argument and talk about these incidences, please understand the word alleged is in front of all those but assuming the facts and the light most favorable to Mr. Wood that in fact a sexual relationship or a romantic relationship occurred between the two and that these events allegedly occurred they certainly were disputed in the underlying case. That being said, assuming that the relationship itself existed and assuming that those three incidents occurred Judge Windmill still appropriately considered the evidence before him on summary judgment appropriately applied the law to those facts and then appropriately dismissed Mr. Wood's claims related to Eighth Amendment cruel and unusual punishment. By no means does the Idaho Department of Corrections support or condone relationships between its officers and the inmates. That is something we wanted to emphasize immediately. There are processes in place to address those circumstances to address those issues there are investigations that are undertaken which were undertaken in Mr. Wood's instance and they are not condoned. Sexual abuse is certainly not condoned. Well this is kind of troubling that there have been other incidents involving Martin before this one so one wonders whether Idaho was doing what it should have done in respect to the protection of inmates. Your Honor, when you look to what the allegations were and the record was not devoid of evidence related to those other allegations if you even look to page 12 of the appellee's brief they outline very nicely actually and cite to the record what she had been alleged of doing and what she was alleged of doing was inappropriate pat searches. The way they were inappropriate is she is about five feet tall which is in the record through the trial that we had Mr. Wood is six foot two. She would rub up against the backs of these inmates when she would do her pat searches part of that because she's up on her toes and she's pressing against them with her breasts. That was not an appropriate way to perform a pat search. Why would they have a woman prison guard give a pat search to a male? If you go through the airport they're going to give you a pat down search and you're a woman a woman gives you the pat down search. Isn't that pretty standard even in prison context? It is and it isn't. You certainly can't prohibit a woman from working in the male prison and not being able to perform the functions of that job as long as they can be performed in a reasonably appropriate manner and they can be and they can be by her receiving counseling of even though you're short you can't do that this way. It's okay for a male prison guard to give a woman prisoner a pat down search. It's something that's within their job performance, yes. I've never heard of that before. Do you have any cases on that? I don't, Your Honor, I'm sorry. The lower court may well have been right on the retaliation but it seems to me at least he was premature. I'm sorry, Your Honor, what was that? The lower court may have been right in his summary judgment on the retaliation claim but it seems to me that he was also premature, that there was still a pending motion that might have resulted in some evidence that would have stopped the motion for summary judgment. Isn't that right? Well, I mean, certainly additional discovery that ultimately Mr. Wood his later counsel at the University of Idaho Legal Clinic could have attempted to uncover They were out now. There's nothing How many times do you have to tell the judge he's wrong? There's nothing barring a motion for reconsideration and that's certainly something that could have been done. Judge Windmill, over eight and a half years stayed the case a couple of times based upon Mr. Wood's request appointed multiple counsel unfortunately having many of them withdraw I mean, there were a lot of accommodations that were made in order to have discovery completed. But they never gave him the documentation that he requested? They didn't. Ultimately, the legal clinic that stepped in we did end up providing them a survey that was performed. It was attorneys' eyes only. And it was a survey that was performed for the Department of Corrections related to officer conduct and that type of thing. We also provided portions of Ms. Martin's and Ms. Thomason's personnel records which they had asked for. And that's the information that they had pushed for. And that was certainly related to any type of retaliatory transfer claim and the law school decided not to pursue those things they entered into a stipulation in April of 2008 and indicated we're not going to pursue any other written discovery, but we are going to pursue deposition discovery beyond this. Nothing forced them, no one forced them to enter into that written stipulation and they had every opportunity to depose whoever they felt they needed to. Was the stipulation entered into before or after the motion to compel? It was entered into after the motion to compel. And after the motion for summary judgment was granted? On the retaliatory transfer claim, yes. Let me ask you this. What legal materials or research opportunities are accorded Idaho state prisoners? There is a law clerk who is available. There's no law library, right? There's not a law library. No library in any of the prisons. So the only legal help they get is from a person employed by the prison. Correct. And there's actually also a prisoner law clerk who does quite a bit for the inmates. Who does have access to research. We have no law library because we're saving money, right? I know that's true. I will just put a plug in that we now have provided copier services that type of thing so they can do all their work. So that's a step that Idaho is taking. See, the reason this case has taken on an entirely different approach is you've got the University of Idaho Law School on this. That's the big reason. And three other attorneys prior to that. Where did they come from? One was an experienced medical malpractice, Bruce Owen is an experienced medical malpractice attorney up in North Idaho because that was also a claim that was being made by Mr. Wood. Mr. Owen looked through the file, talked to Mr. Wood and submitted an affidavit that is in the record that indicates, I can't pursue Mr. Wood's medical malpractice claim and I've never handled a Section 1983 claim before. Therefore I'm not able to Oh, you've never handled one before. Excuse me? No, this is the attorney that was asserting that. That's why we have the Idaho Law School in here. And Mr. Saunders is not with the Idaho Law School. Mr. Wood actually fired the Idaho Law School after he lost the trial and Mr. Saunders is from a large firm in Washington, D.C. and was appointed. That's what he does. He handles these matters. He's an expert on this. I don't know if he's an expert on Section 1983 cases. Okay. So But as far as the prisoners are concerned there's no law library the only assistance they would get would be from a state employee and there's an inmate in the prison who's experienced in these prisoner matters. That's my understanding, Your Honor, at least at that time. The other thing though that cannot be ignored is he was provided counsel on several occasions and in two of those occasions he terminated his own counsel. So he was provided pro se counsel to assist him and he fired them. So the court reached out and attempted to get him assistance and unfortunately twice, and even during trial, Judge Shub had to talk Mr. Wood off the fence of firing his counsel during the middle of trial and was able to do so. But I guess sorry, my Montana roots but you can lead a horse to water you can't make it drink. And so opportunities were provided to Mr. Wood. Well, I've ridden horses in Montana and they've had a good drink with me. Very good. Then you know the saying and you're well familiar with it you can't control them at all times. Well, it all depends on the horse. We'll disagree on that one. Back to the legal principles is it possible for a prisoner ever to be deemed to have given consent? With respect to a relationship? Yes. Yes, it is. And there's no Ninth Circuit case law on that and so we've relied upon Freitas to argue that. But there is no statute in Idaho that indicates they can't consent. There are criminal statutes related to an employee or agent of the department having sexual relationships with an inmate. But there is no case law that indicates that they're not in a position to consent. Should that be the law? Since there is no Ninth Circuit law on the point we're going to be making it. So what should the principle be? An inmate should not be permitted to engage in a consensual relationship and then be able to turn around and whether it's gone south or whether they were doing it just to set themselves up for a lawsuit and to file a lawsuit. If you find that an inmate is incapable of consenting to any type of relationship, even if it were one that was very welcomed, these relationships that occur in some of the cases that we sent you with the pastor that was having a relationship if you do that you're going to have an impact on the prison system, on the state of Idaho and other states Well I'm sure we are but the question is should we? Sure and the answer to that is you know you can't take away their ability to consent to these relationships not that these relationships are condoned. There are processes in place to deal with these relationships in the event they occur and that is where it should be left. But to empower inmates to have some type of relationship with their pastors that are in the prison with their law clerks who are in the prison or with prison guards themselves that would create I think a very detrimental impact on the penological systems here throughout our district Why? Because you're allowing someone to engage you would basically be allowing Mr. Wood in this context to enjoy a relationship that he says he wanted and had Ms. Martin not been married he would have felt like he would have done whatever with her he could have married her he said and then if you were to say as a court they can't consent to that type of relationship and he turns around and sues for whatever reason whether he intended to sue from day one of the relationship or whether the relationship soured that is not something that that burden should not be placed on the Department of Corrections throughout our district So is there middle ground here? Is there middle ground saying that this is a rebuttable presumption? I don't know if it's a rebuttable presumption but there is middle ground and it's the analysis that's used in evaluating cruel and unusual punishment is you look to the objective factors and you look to the subjective factors and we are not saying that consent in and of itself just equates if you had a relationship then that guard could do anything to you it's a component of that subjective objective analysis it is one of the factors that goes into determining was this done with malicious intent was this done against common decency So what's wrong with the idea that prison guards shouldn't be doing it but there would be a rebuttable and presumption would be that the 1983 was valid but if there was a consent it would be rebutted and that would be the end of it I think that would be one appropriate way to approach it Well it would cut down on your lawsuits wouldn't it? Certainly With that, your honors unless there's any other questions Well the prison guards they certainly have a great deal of power over the prisoners They do but even if you look at this instance if you were to create a blanket rule where it doesn't matter if you consent you still have a valid cruel and unusual punishment claim look at this case the power was in Mr. Wood's hands and he even admits that he allegedly had a locket of Ms. Martin's hair and would use it as a tool and say I'm going to turn you in for having a relationship with me if you don't leave me in this next prison garden Shouldn't that be a question that goes to a jury or a trier of fact? Not in this case because you have to read Mr. Wood's deposition you have to see what he says occurred Well then you know if that's the case let a trier of fact make the decision But there has to be a material issue of disputed fact and there wasn't based on Mr. Wood's own admissions in his deposition that's why Judge Windmill granted summary judgment on all three of those issues So he applied the wrong legal standard Did he apply the wrong legal standard? Judge Windmill? No No, he didn't He applied the appropriate legal standard by looking to whether or not there was a disputed material issue of fact and then he considered the Freitas analysis with respect to the two incidences that occurred during the relationship by looking to the subjective and objective components of Eighth Amendment law and then he took the third one and did the same, it just didn't have the consent analysis contained within it What if we had a different situation where you had a male prison guard and a female prisoner and all this happened It'd be the same It would be the same and it's the same because it's a consensual romantic relationship that the two developed and it's not as if they just occur willy-nilly there are statutes in place there are mechanisms in place to punish the employee for having this type of relationship but the Eighth Amendment isn't it when it's this type of relationship Well what about these records that were never turned over if they exist The records related to just to clarify on that too records were turned over related to all the investigations related to Mr. Wood they were redacted to take out prisoner names and what the prisoner said so that Mr. Wood couldn't then hunt down whoever had gone against him or whatever that was it was to protect their privacy so they felt like they could participate in the investigative process but we did overturn provide all of the investigative summaries that were done with respect to the Wood claim with respect to the others that were made we provided them information from Lt. Thomason and they even took Lt. Thomason's deposition this was the law students you know the legal clinic who have an attorney that guide them through this who attends all the depositions with them they were able to go through all of these things with Lt. Thomason and they chose not to this was 8 and a half years of discovery and to reopen things now we've been through a week long trial over 16 searches which is not at issue today but to reopen this and have Ms. Martin subjected to additional harassment over things that the attorneys for Mr. Wood could have done that's just not the way the process should work and when you do look to what was turned over as I was indicating earlier what was turned over were things about her placing hands on good correctional practice such as walking up you can't do in a prison you can't walk up and touch somebody's arm and say how are you today pat them on the shoulder those were inappropriate contacts according to the Idaho Department of Corrections that's what she was reprimanded for and that's on page 12 of plaintiff's brief and they cite to each and every one of those it wasn't about her kissing, hugging having sex with an inmate there was only one other allegation related to that which they were provided information for and she was cleared of that allegation Who cleared her? The Department of Corrections Lt. Thomason who was one of the individuals involved in that investigation who the lawyers for Mr. Wood deposed and didn't question her about was one of the individuals who cleared her of that alleged wrongdoing Thank you counsel Thank you Do you want a minute for rebuttal? Frankly I'm more concerned about the supervisory or the lack thereof of the prison supervisors than I am I guess I've been too long on the district bench but I kind of say this is for the entertainment value of the plaintiff but it seems to me that the  police their guards I think that's certainly the case and I also think I would refer this court to the Gomez v. Vernon decision You speak up a little The Gomez v. Vernon decision which was a decision of this court shortly before these incidents that occurred that talked in depth about the pattern of retaliation in the Idaho prisons and I think that's one of the big concerns that is in the background of this case is when we talk about the issue of consent I think quite frankly you have seen a sea change in terms of the national consensus on this issue that would be sufficient to say that under evolving standards of decency a prisoner cannot consent but even short of that I think it's going to be a very rare instance in which you could find consent as a matter of law I direct you to Judge Gertner's decision in the Troy case we cite in her brief where she goes in detail about this and one of the things the way this connects up is because one of the things looming in the background of this case even in the supposedly consensual portion of his relationship Wood is in the dark regarding Martin's marital status She has access to him that she has by virtue of being a prison guard the ability to enter his cell Speak into the microphone She has access by virtue of her being a prison guard the ability to enter his cell to conduct pad searches and this is all against the backdrop of the institutional culture that had been at issue in Gomez v. Vernon One thing Sam if I could just make clear on the retaliatory transfer claim that all occurred in terms of the dismissal of that claim on summary judgment before Mr. Wood had counseled, before there was an opportunity to inquire into this Yes, the law students did later depose Lieutenant Thomason. She was instructed in that deposition not to answer questions revealing the names of other specific inmates with whom there had been investigations You can see that on excerpts of record 491 But even if the law students then could have taken the remedial action and gotten that information out, the fact of the matter is that the claim for the retaliatory transfer had already been dismissed and there's no obligation when subsequent counsel comes in like that for them to try to reopen that claim and this court should remand on that claim as well Do you know of any other jurisdiction where a male prison guard is authorized to give a full pat-down search to a female prisoner I guess I would say that I am constrained by this court's prior decisions in the sense that you do have the Jordan v. Gardner en banc decision by this court that held that it was an 8th amendment violation for male prison guards to be doing random pat searches on female prisoners and part of the reasoning of that case had to do with specific background on sexual abuse. I think one difficulty is that in Grumman v. Russian which is 779 F. 2nd 491 this court had held that the 8th amendment was not violated just by the fact that female prison guards were doing pat searches of male prisoners. So one of the reasons we didn't make that argument in our brief is that we felt constrained by circuit precedent. That is certainly an issue that could be raised at a higher level. Now that said the fact that the mere cross gender aspect of it. Well but you have one factor here that probably is unique or unusual and that is his religious belief about committing adultery. How big a factor does that play in this case? I think it plays a very big factor when you analyze consent particularly on this issue of the deposition testimony about the conduct not being per se objectionable because I think when you talk about consent consent means something freely given and in this case questions about what might have been the case on another set of facts don't let you then say that as a matter of law Mr. Woods expressed objection was somehow illegitimate or to doubt the reasons behind that and I think particularly when as the record clearly shows it was a religiously based objection you're getting onto very tenuous ground if a court is saying at the summary judgment stage that I'm essentially disregarding that objection. Thank you. The matter will stand submitted and we'll come to the next case Bert M. Fernandez versus United States of America
judges: Walter, Fletcher, Pregerson